**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
HOME LOAN MORTGAGE
CORPORATION,

                  Plaintiff,

      -against-

GENERAL ELECTRIC COMPANY,
GENERAL ELECTRIC CAPITAL
SERVICES, INC. d/b/a GE CONSUMER
FINANCE or GE MONEY, GE MORTGAGE
HOLDING, L.L.C., GE-WMC MORTGAGE
SECURITIES, L.L.C., MORGAN STANLEY
& CO., INC., and CREDIT SUISSE
SECURITIES (USA) LLC f/k/a CREDIT
SUISSE FIRST BOSTON LLC,

                Defendants.

**11 Civ. 7048 (DLC)**


**<u>AMENDED COMPLAINT</u>**



## **TABLE OF CONTENTS**

Page

NATURE OF ACTION ............................................................................................... 1

    PARTIES ............................................................................................................ 5

    Plaintiff and Freddie Mac ................................................................................. 5

    Defendants ........................................................................................................ 6

    The GE Defendants ........................................................................................... 6

    The Underwriter Defendants ............................................................................ 7

    The Non-Party Originator ................................................................................. 8

JURISDICTION AND VENUE ................................................................................. 8

FACTUAL ALLEGATIONS ..................................................................................... 9

I.     THE SECURITIZATIONS ................................................................................ 9

    A.    Residential Mortgage-Backed Securitizations Generally ................... 9

    B.    The Securitizations At Issue In This Case ......................................... 11

    C.    The Securitization Process ................................................................. 11

        1.    The Sponsor Grouped Mortgage Loans in Special Purpose Trusts .......... 11

        2.    The Trusts Issued Securities Backed by the Loans .................................. 12

II.    DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS .............. 14

    A.    The GE Control Persons:  General Electric and GE Capital ................. 15

    B.    The GE Sponsor:  GE Mortgage Holding ............................................. 16

    C.    The GE Depositor:  GE-WMC Mortgage Securities .............................. 17

    D.    The Underwriter Defendants ............................................................... 18

III.    STATEMENTS IN THE REGISTRATION STATEMENTS ........................................ 19

    A.    Compliance with Underwriting Guidelines .......................................... 19

    B.    Occupancy Status of Borrower ............................................................. 22

C.     Loan-to-Value Ratios ............................................................24

D.     Credit Ratings .....................................................................26

IV.   FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS...................28

A.   The Statistical Data Provided in the Prospectus  Supplements Concerning Owner-Occupancy and  Loan-To-Value Ratios Was Materially False or Misleading ............................................................................28

1.     Owner-Occupancy Data Was Materially False or Misleading.................29

2.     Loan-to-Value Data Was Materially False ................................31

B.   The Originator of the Underlying Mortgage Loans Systematically Disregarded Its Underwriting Guidelines...............................................35

1.     A Forensic Review of Loan Files Has Revealed Pervasive Failure to Adhere to Underwriting Guidelines ........................35

2.     Both Government and Private Investigations Confirm That the Originator of the Loans in the Securitizations Systematically Failed to Adhere to Its Underwriting Guidelines ................................44

3.     The Decline in the Certificates' Credit Ratings  Further Shows that the Mortgage Loans Were Not  Originated in Adherence to the Stated Underwriting Guidelines ................................49

4.     The Surge in Mortgage Delinquency and Default Further Demonstrates That the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ......................50

V.    FREDDIE MAC'S PURCHASE OF THE CERTIFICATES ............................51

VI.   FREDDIE MAC WAS DAMAGED BY DEFENDANTS' VIOLATIONS OF LAW ............................................................................51

FIRST CAUSE OF ACTION ........................................................53

SECOND CAUSE OF ACTION .....................................................55

THIRD CAUSE OF ACTION ........................................................58

FOURTH CAUSE OF ACTION .....................................................60

FIFTH CAUSE OF ACTION ........................................................63

PRAYER FOR RELIEF ...............................................................66

Plaintiff Federal Housing Finance Agency ("Plaintiff" or "FHFA"), as Conservator of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Kasowitz, Benson, Torres & Friedman LLP, for its Complaint against the defendants named herein ("Defendants"), alleges as follows:

## NATURE OF ACTION

1.      This action arises from false and misleading statements and omissions in registration statements, prospectuses, and prospectus supplements pursuant to which certain residential mortgage-backed securities ("RMBS") were purchased by Freddie Mac.  Among other things, these documents falsely represented that the mortgage loans underlying the RMBS complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans.  These representations were material to reasonable investors, including Freddie Mac, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, as well as Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code (the "Virginia Securities Act").  Defendants' statements and omissions give rise to strict statutory liability under federal securities law and liability under state law.

2.      Between September 28, 2005 and December 19, 2005, Freddie Mac purchased over $549 million in Certificates issued in connection with two securitizations that were sponsored by GE entities.[1]

3.      The Certificates were offered for sale pursuant to a shelf registration statement (the "Shelf Registration Statement") filed with the Securities and Exchange Commission (the

_____

[1]      For purposes of this Amended Complaint, the securities issued under the Registration Statements (as defined in note 2, *infra*) are referred to as "Certificates."  Holders of Certificates are referred to as "Certificateholders."

"SEC").  For each of the securitizations whose certificates were sold to Freddie Mac ("the Securitizations"), a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement" together with the Shelf Registration Statement and Prospectus Supplements, the "Registration Statements") were filed with the SEC as part of the Registration Statement for that Securitization.[2]  The Certificates were marketed and sold to Freddie Mac pursuant to the Registration Statements.

4.      The Registration Statements contained representations concerning, among other things, the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers on those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such representations were material to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac.  Unbeknownst to Freddie Mac, those representations were materially false because, among other reasons, many of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and did not have the credit quality and other characteristics set forth in the Registration Statements.

5.      Among other things, the Registration Statements presented the loan origination guidelines of the mortgage loan originator that originated the loans that underlie the Certificates. The Registration Statements falsely represented that those guidelines were adhered to except in specified circumstances, when in fact the guidelines systematically were disregarded in that the loans were not originated in accordance with those guidelines.

_____

[2]      The term "Registration Statement," as used herein, and in Appendix A attached hereto, incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

6.    An initial forensic review of loan origination files has revealed that the vast majority of loans reviewed did not adhere to the originator's underwriting guidelines as represented in the Registration Statements. A material discrepancy from underwriting guidelines is very serious, and means that the loan should never have been included in the Securitizations. For example, the loan application may: (i) lack key documentation necessary to properly underwrite the loan; (ii) include an invalid, incomplete, or unsupported appraisal; (iii) evidence the underwriter's failure to confirm the reasonableness of the borrower's stated income; or (iv) reflect that the borrower's income, FICO score, debt, debt-to-income ratio ("DTI"), or loan-to-value ratio ("LTV") are outside of the range permitted under the guidelines. Adherence to underwriting guidelines, particularly on such key criteria bearing on loan eligibility, is a material consideration to reasonable investors.

7.    The Registration Statements also set forth for each Securitization statistical summaries of the characteristics of the underlying mortgage loans, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges. This information was material to reasonable investors, and it was material to Freddie Mac. However, a loan-level analysis of a statistically significant sample of loans for each Securitization -- a review that encompassed in the aggregate thousands of mortgages across the Securitizations -- has revealed that for each Securitization these statistical summaries were false and misleading. The statistics reflected or were based upon misrepresentations of other key characteristics of the mortgage loans and inflated property values.

8.    For example, the percentage of owner-occupied properties in the loan pool underlying a RMBS is a material risk factor to purchasers of certificates, such as Freddie Mac,

because a borrower who actually lives in a mortgaged property is generally less likely to stop paying the mortgage and more likely to take care of the property. The loan-level review revealed that the true percentage of owner-occupied properties for the loans supporting the Certificates was materially lower than that represented in the Registration Statements. Likewise, the Registration Statements misrepresented such material information as loan-to-value ratios -- that is, the relationship between the principal amount of the loans and the true value of the mortgaged properties securing those loans -- and the ability of the individual borrowers to satisfy their debts.

9.      The Registration Statements also set forth ratings for each of the Securitizations. Those AAA ratings were material to a reasonable investor's decision to purchase the Certificates, and they were material to Freddie Mac. The ratings for the Securitizations were based upon false information supplied by Defendants and were materially misleading with respect to the credit quality of the Certificates. Upon information and belief, neither Defendants nor the rating agencies that issued the ratings believed or had any sound basis to believe in their truthfulness.

10.      Defendants, who are issuers, sponsors, and/or underwriters of the Certificates purchased by Freddie Mac, are liable for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Freddie Mac, or because they directed and controlled the entities that did so.[3]

11.      Defendants' misstatements and omissions of material facts have caused loss and injury to Freddie Mac. Freddie Mac purchased the highest rated tranches of Certificates offered for sale by Defendants. Freddie Mac would not have purchased these Certificates but for

_____

[3] The Certificates purchased by Freddie Mac are identified below in paragraph 33 and are listed *infra* in Table 9.

4

Defendants' material misrepresentations and omissions concerning the mortgage loans underlying the RMBS. As the truth concerning the misrepresented and omitted facts has come to light, and as the hidden risks have materialized, the market value of the Certificates purchased by Freddie Mac has declined. Freddie Mac has suffered enormous financial losses as a result of the Defendants' misrepresentations and omissions. FHFA, as Conservator for Freddie Mac, now seeks rescission and damages for those losses.

## PARTIES

### Plaintiff and Freddie Mac

12.     Plaintiff, the Federal Housing Finance Agency, is a federal agency located at 400 7th Street, S.W., in Washington, D.C. FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654, codified at 12 U.S.C. § 4617 *et seq.* ("HERA"), to oversee Freddie Mac, the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Banks. On September 6, 2008, the Director of FHFA, also pursuant to HERA, placed Freddie Mac into conservatorship and appointed FHFA as Conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of Freddie Mac, including, but not limited to, the authority to bring suits on behalf of and/or for the benefit of Freddie Mac. 12 U.S.C. § 4617(b)(2).

13.     Freddie Mac is a government-sponsored enterprise (a "GSE") chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets. As part of this mission, Freddie Mac invested in RMBS. Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

**Defendants**

**The GE Defendants**

14.    Defendant General Electric Company ("General Electric") is a leading multi-national technology, services, and finance company with approximately $739 billion of assets, and operations in more than 100 countries.  General Electric is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut 06828.  General Electric is the parent and sole owner of Defendant General Electric Capital Services, Inc., and, upon information and belief, the ultimate parent of Defendants GE Mortgage Holding, LLC and GE-WMC Mortgage Securities, LLC.  General Electric transacts billions of dollars in business within New York State annually in furtherance of its various businesses.

15.    Defendant General Electric Capital Services, Inc. ("GE Capital"), doing business as GE Consumer Finance or GE Money, is a leading multi-national financial services company with approximately $605 billion in assets and operations in more than 50 countries.  GE Capital is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut 06828.  GE Capital maintains an office at 299 Park Avenue, New York, New York 10171.

16.    Upon information and belief, GE Capital is the parent and sole shareholder of Defendant GE Mortgage Holding, LLC ("GE Mortgage Holding").

17.    Prior to losing its license to operate in June 2008 for the non-payment of taxes, GE Mortgage Holding was a limited liability company organized and existing under the laws of the State of Delaware.  GE Mortgage Holding was the parent and sole owner of GE-WMC Mortgage Securities, LLC.   For both Securitizations, GE Mortgage Holding was the sponsor --

.

6

the entity that acquires or originates the mortgage loans. Upon information and belief, GE Capital is the parent and/or successor-in-interest to GE Mortgage Holding.

18.     Defendant GE-WMC Mortgage Securities, LLC ("GE-WMC Mortgage Securities") is a limited liability company organized and existing under the laws of the State of Delaware. GE-WMC Mortgage Securities' principal office is located at 3100 Thornton Avenue, Office 344, Burbank, California 91504. GE-WMC Mortgage Securities was the depositor for both Securitizations. As depositor, GE-WMC Mortgage Securities was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934. In connection with the Securitizations, GE-WMC Mortgage Securities delivered the mortgage loans to the trustee, Bank of New York, in New York. Defendants General Electric, GE Capital, GE Mortgage Holding, and GE-WMC Mortgage Securities are referred to together herein as "GE."

### The Underwriter Defendants

19.     Defendant Morgan Stanley & Co., Inc. ("MS&Co.") is a corporation organized and existing under the State of Delaware, with its principal offices at 1585 Broadway, New York, New York 10036. MS&Co. is an SEC-registered broker-dealer. Freddie Mac purchased the Certificates for the GE-WMC 2005-1 Securitization from MS&Co.

20.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 11 Madison Avenue, New York, New York 10010. Prior to January 16, 2006, Credit Suisse was known as Credit Suisse First Boston LLC. Credit Suisse is an SEC-registered broker-dealer. Freddie Mac purchased the Certificates for the GE-WMC 2005-2 Securitization from Credit Suisse. MS&Co. and Credit Suisse are referred to herein as the "Underwriter Defendants."

7

### The Non-Party Originator

21.      WMC Mortgage Corporation ("WMC"), now known as WMC Mortgage, LLC, is a company organized and existing under the laws of the State of California.  Established in 1955, WMC developed a national mortgage origination franchise with a special emphasis on originating single-family, alternative subprime mortgage loans.  It had nine regional offices, including an office in New York.  WMC was owned by a subsidiary of Weyerhaeuser Company until May 1997, when it was sold to WMC Finance.  In 2004, Defendant GE Capital acquired WMC Finance and its subsidiary, WMC.

22.      WMC publicly touted its ability to finance up to 95 percent loan-to-value loans, working with applicants with FICO scores as low as 530.  However, according to a March 2007 article published on *MortgageDaily.com*, WMC, faced with growing delinquencies, announced that it would no longer originate mortgages without a down payment.  Shortly after, on September 20, 2007, Defendant GE Capital closed WMC's operations, taking a $400 million write-down as a result.

23.      GE Mortgage Holding, the sponsor for each Securitization, acquired all of the loans underlying the Certificates from WMC, the originator.  As discussed *infra,* it was only well after WMC ceased operations on September 20, 2007 that disclosures began to emerge regarding WMC's loan origination practices.

### JURISDICTION AND VENUE

24.      Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Freddie Mac.

25.      Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities

Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77(o).  This Court further has jurisdiction over the

Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

26.     This Court has jurisdiction over Plaintiff's claims of violations of Sections 13.1-

522(A)(ii) and 13.1-522(C) of the Virginia Code pursuant to this Court's supplemental

jurisdiction under 28 U.S.C. § 1367(a).

27.     Venue is proper in this District pursuant to Section 22 of the Securities Act of

1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Defendants are principally located in this

District, and many of the acts and transactions alleged herein, including the preparation and

dissemination of the Registration Statements, occurred in substantial part within this District.

Additionally, the Certificates were actively marketed and sold from this District.  Defendants

also are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I.      THE SECURITIZATIONS

#### A.      Residential Mortgage-Backed Securitizations Generally

28.     Asset-backed securitization involves pooling cash-producing financial assets and

issuing securities backed by those pools of assets.  In residential mortgage-backed

securitizations, the cash-producing financial assets are residential mortgage loans.

29.     In the most common form of securitization of mortgage loans, a sponsor -- the

entity that acquires or originates the mortgage loans and initiates the securitization -- directly or

indirectly transfers a portfolio of mortgage loans to a trust.  In many instances, the transfer of

assets to the trust is a two-step process in which the sponsor first transfers the financial assets to

an intermediate entity, typically referred to as a "depositor," and then the depositor transfers the

assets to a trust.  The trust is established pursuant to a pooling and servicing agreement or a trust

indenture entered into by, among others, the depositor for that securitization.

9

30.     RMBS are the securities backed by the underlying mortgage loans in the trust. Some residential mortgage-backed securitizations are created from more than one cohort of loans, called collateral groups, in which case the trust issues different tranches of securities backed by different groups of loans.[4]  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities (in the form of certificates) acquire an ownership interest in the trust, which in turn owns the loans.  These purchasers are thus primarily dependent for repayment of principal and payment of interest upon the cash flows from the designated group of mortgage loans -- primarily mortgagors' payments of principal and interest on the mortgage loans held by the related trust.

31.     RMBS are generally issued and sold pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which describe the general structure of the investment, and prospectus supplements, which set forth detailed descriptions of, among other things, the mortgage groups underlying the certificates.  Certificates are issued by the trust and sold pursuant to the registration statement, the prospectus, and prospectus supplement.  Underwriters purchase the certificates from the trust and then offer, sell or distribute the certificates to investors.

32.     A mortgage servicer manages the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and

---

[4]     A tranche is one of the classes of debt securities issued as part of a securitization/issuance.  Securities are often issued in tranches to meet different investor objectives for portfolio diversification.

determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust funds and delivers payments due each month on the certificates to the investors.

**B.**   **The Securitizations At Issue In This Case**

33.     This case involves the following two Securitizations:

>  A) GE-WMC Asset-Backed Pass-Through Certificates, Series 2005-1 ("GE-WMC 2005-1")
>
>  B) GE-WMC Asset-Backed Pass-Through Certificates, Series 2005-2 ("GE-WMC 2005-2")

34.     For each of the Securitizations, Table 1 identifies the:  (1) sponsor; (2) depositor; (3) underwriter(s); (4) principal amount issued for the tranches purchased by Freddie Mac; (5) date of issuance; and (6) loan group or groups backing the Certificate for that Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| GE-WMC 2005-1 | A1 | GE Mortgage Holding | GE-WMC Mortgage Securities | MS&Co. Merrill Lynch | 230,365,000.00 | 09/28/05 | Group I |
| GE-WMC 2005-2 | A1 | GE Mortgage Holding | GE-WMC Mortgage Securities | Credit Suisse MS&Co. | 319,314,000.00 | 12/19/05 | Group I |

**C.**   **The Securitization Process**

**1.**   **The Sponsor Grouped Mortgage Loans in Special Purpose Trusts**

35.     As the sponsor for each of the Securitizations, GE Mortgage Holding acquired the loans underlying the Certificates from WMC, the originator.

11

36.     GE Mortgage Holding then sold the mortgage loans for the Securitizations that it sponsored to its subsidiary and the depositor, GE-WMC Mortgage Securities, pursuant to a Mortgage Loan Purchase Agreement that contained various representations and warranties regarding the mortgage loans comprising the Securitizations.  GE-WMC Mortgage Securities was a wholly-owned, limited-purpose financial subsidiary and limited-purpose affiliate of GE Mortgage Holding.  The sole purpose of GE-WMC Mortgage Securities, as depositor, was to act as a conduit through which loans originated by its affiliate, WMC, could be securitized and sold to investors.

37.     Defendant Credit Suisse was the selling underwriter for GE-WMC 2005-2.  MS&Co. was the selling underwriter for GE-WMC 2005-1.

38.     As depositor for each of the Securitizations, GE-WMC Mortgage Securities ostensibly transferred the relevant mortgage loans to the respective trusts for each of those Securitizations.

39.     As part of each Securitization, the trustee for that Securitization, on behalf of the Certificateholders, executed a Pooling and Servicing Agreement ("PSA") with GE-WMC Securities and the relevant servicer.  In each case, the trust, administered by the trustee, was required to hold the mortgage loans pursuant to the related PSA, and issued certificates, including the Certificates.  The Certificates were purchased, directly or indirectly, by MS&Co. and Credit Suisse (the "Underwriter Defendants").  Freddie Mac purchased from the Underwriter Defendants the Certificates, through which it obtained an ownership interest in the trust, including the mortgage loans.

### 2.     The Trusts Issued Securities Backed by the Loans

40.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates

were then sold to investors, including Freddie Mac. Each Certificate entitles its holder to a specified portion of the cash flows from the underlying mortgages in the supporting loan group for that Certificate. Therefore, the value of the Certificates, derived in part from the likelihood of payment of principal and interest on the mortgages underlying the Securitizations, depends upon the credit quality of those underlying mortgages, *i.e.*, the risk of default by borrowers and the recovery value upon default of foreclosed-upon properties.

41.    The Certificates purchased by Freddie Mac were issued and sold pursuant to a Shelf Registration Statement filed with the SEC on a Form S-3. The Shelf Registration Statement ("S-3") was amended by a Form S-3/A (the "Amendment" or "S-3/A") filed with the SEC. The SEC filing number, registrant, and filing date for the Shelf Registration Statement and Amendment thereto, as well as the Certificates purchased by Freddie Mac covered by the Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date S-3 Filed | Date S-3/A Filed | Registrant | Covered Certificates |
|---|---|---|---|---|
| 333-127360 | 08/09/05 | 08/30/05 | GE-WMC Mortgage Securities | GE-WMC 2005-1 GE-WMC 2005-2 |

42.    The Prospectus Supplement for each Securitization describes the loan underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans. In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including: the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios of the borrowers, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes, information concerning

13

whether the loans were secured by a property to be used as a primary residence, second home, or investment property, and information concerning whether the loans were delinquent.

43.     The Prospectus Supplement for each Securitization was filed with the SEC as part of the Registration Statement.  The Forms 8-K attaching the PSA for each Securitization were also filed with the SEC.  The dates on which the Prospectus Supplement and Forms 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| GE-WMC 2005-1 | 09/28/05 | 10/13/05 | 333-127360 |
| GE-WMC 2005-2 | 12/16/05 | 01/04/06 | 333-127360 |

44.     The Certificates were issued pursuant to the PSAs, and the Underwriter Defendants offered and sold the Certificates to Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.

## II.     DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

45.     Each of the Defendants played a role in the securitization process and the marketing for some or all of the Certificates purchased by Freddie Mac, which included purchasing the mortgage loans from the originator, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, arranging the Securitizations, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to Freddie Mac.

46.     Defendants are liable, jointly and severally, as participants in the registration, issuance, and offering of the Certificates purchased by Freddie Mac, including issuing, causing, or making materially misleading statements in the Registration Statements, and omitting material

facts required to be stated therein or necessary to make the statements contained therein not misleading.

**A.      The GE Control Persons:  General Electric and GE Capital**

47.      General Electric wholly owns GE Capital, and is the ultimate parent of GE Mortgage Holding, GE-WMC Mortgage Securities, and WMC.  The chart below indicates the corporate structure of GE.



48.      General Electric employed its subsidiaries or affiliates GE Mortgage Holding, GE-WMC Mortgage Securities, and WMC to effectuate the securitization process.  Unlike typical arms-length transactions, the Securitizations here involved General Electric subsidiaries or affiliates at each step in the chain.  For each of the Securitizations, GE Mortgage Holding served as the sponsor, GE-WMC Mortgage Securities served as depositor, and non-party WMC served as the originator.

49.      As the corporate parent of GE Capital, and the ultimate parent of GE Mortgage Holding, GE-WMC Mortgage Securities, General Electric had the practical ability to and in fact

did exercise direction and control over these subsidiaries in coordinating the securitization process, determining the structure of each offering, and issuing and selling the Certificates purchased by Freddie Mac.

50.     As detailed, *supra*, the Securitizations involved GE entities at virtually every step in the process, and General Electric profited substantially from this vertically integrated approach to mortgage-backed securitization.  Furthermore, on information and belief, General Electric shared, during the relevant time, overlapping management with the other GE entities. For instance, Daniel C. Janki served as Vice President of Corporate Investor Relations and Vice President of Corporate Investor Communications of General Electric, as well as Manager of GE-WMC Mortgage Securities (the "GE Depositor").  Greg MacFarlane was Executive Vice President and Chief Financial Officer of GE-WMC Mortgage Securities, and a Manager of the GE Depositor.  Todd Wallace was a Manager of the GE Depositor while also Executive Vice President of WMC.

51.     Upon information and belief, GE Capital wholly owns GE Mortgage Holding (the "GE Sponsor").  As the sole corporate parent of the GE Sponsor, GE Capital had the practical ability to and in fact did exercise direction and control over the actions of the GE Sponsor.

**B.     The GE Sponsor:  GE Mortgage Holding**

52.     Upon information and belief, GE Mortgage Holding was a wholly-owned subsidiary of GE Capital that was formed for the purpose of issuing securities through its wholly-owned subsidiary, the GE Depositor.

53.     As sponsor of each of the Securitizations, the GE Sponsor determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the rating agencies to secure investment-grade ratings for the Certificates sold to Freddie Mac.  The GE

Sponsor also selected its wholly-owned subsidiary, the GE Depositor, as the special-purpose vehicle that would be used to transfer the mortgage loans from the GE Sponsor to the trusts, and selected the Underwriter Defendants as underwriters for the Securitizations. In its role as sponsor, the GE Sponsor knew and intended that the mortgage loans it purchased from its affiliate, WMC, would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

54.     For each Securitization that it sponsored, the GE Sponsor also ostensibly conveyed the mortgage loans to the GE Depositor pursuant to a Mortgage Loan Purchase Agreement. In these agreements, the Non-Party Originator and the GE Sponsor made certain representations and warranties to the GE Depositor regarding the mortgage loans collateralizing the Certificates purchased by Freddie Mac. These representations and warranties were assigned by the GE Depositor to the trustee for the benefit of the Certificateholders, and were described in the Prospectus Supplements.

**C.      The GE Depositor:  GE-WMC Mortgage Securities**

55.     The GE Depositor is a wholly-owned subsidiary of the GE Sponsor. The GE Depositor was a special-purpose entity formed by the GE Sponsor solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the Certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

56.     The GE Depositor was the depositor for each of the Securitizations. In its capacity as depositor, the GE Depositor purchased the mortgage loans from the GE Sponsor pursuant to a Mortgage Loan Purchase Agreement. The GE Depositor then sold, transferred, or otherwise conveyed the mortgage loans to the trusts. Together with the other Defendants, the

17

GE Depositor was responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale. The trusts, in turn, held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Freddie Mac.

### D.     The Underwriter Defendants

57.     The Underwriter Defendants were two of the nation's largest non-agency mortgage-backed securities underwriters between 2004 and 2007. During those years, Credit Suisse was one of the top ten underwriters of non-agency mortgage-backed securities, underwriting $67.5 billion in 2004 (ranking 5th); $89.2 billion in 2005 (ranking 5th); $69.4 billion in 2006 (ranking 7th); and $44.1 billion in 2007 (ranking 6th). Likewise, MS&Co. was one of the top ten underwriters of non-agency mortgage-backed securities during most of those years, underwriting $43.7 billion in 2004 (ranking 7th); $53.9 billion in 2006 (ranking 10th); and $40 billion in 2007 (ranking 8th).[5]

58.     As underwriters for the Securitizations, Credit Suisse and MS&Co. were responsible for underwriting and managing the offer and sale of the Certificates to Freddie Mac, as well as other investors. Credit Suisse and MS&Co. were also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

---

[5]     "Agency" mortgage-backed securities are guaranteed by a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency" mortgage-backed securities are issued by banks and financial companies not associated with a government agency or government sponsored enterprise.

III.   **STATEMENTS IN THE REGISTRATION STATEMENTS**

59.    Plaintiff relies for its claims, in part, upon the Registration Statements in their entirety.  Specific representations and warranties in the Registration Statements that form the basis for the claims herein are set forth for each Securitization in Appendix A hereto.

A.    **Compliance with Underwriting Guidelines**

60.    The Prospectus and Prospectus Supplement for each of the Securitizations contained detailed descriptions of the underwriting guidelines used to originate the mortgage loans included in the Securitizations.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  Because payment on, and the value of, the Certificates is based on the cash flows from the underlying mortgage pool, representations concerning compliance with the stated underwriting guidelines were material to reasonable investors.  Investors, including Freddie Mac, did not have access to information concerning the collateral pool, and were required to rely on the representations in the Prospectus Supplements concerning that collateral.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systemic breaches of those guidelines with respect to the securitized loans.

61.    Among other consequences, the failure to originate mortgage loans in accordance with stated guidelines diminished the value of the Certificates by significantly increasing the risk that an investor will not be paid its principal and interest.  Misrepresentations concerning, or failing accurately to disclose, borrower, loan, and property characteristics bearing on the risk of default by the borrower as well as the severity of losses given default can artificially inflate the perceived value of the securities.  Without accurate information regarding the collateral pool,

reasonable investors, including Freddie Mac, are unable accurately and independently to assess

whether the price of an RMBS adequately accounts for the risks they are assuming when they

purchase the security.

62.     The Prospectus Supplements for each of the Securitizations contained several key

statements with respect to the loan purchasing and underwriting standards of WMC, the entity

that originated the loans in the Securitizations.  For example, the Prospectus Supplement for each

of the Securitizations, for which WMC was the originator, GE Mortgage Holding was the

sponsor, GE-WMC Mortgage Securities was the depositor, and Credit Suisse and MS&Co. were

the underwriters, stated:

> The mortgage loans have been either (i) originated generally *in accordance with*
> *the underwriting guidelines established by WMC Mortgage Corp.* (collectively,
> the "Underwriting Guidelines") or (ii) purchased from correspondent lenders after
> being re-underwritten by WMC Mortgage Corp., generally in accordance with the
> Underwriting Guidelines.  (GE-WMC 2005-1 Prospectus Suppl. at S-24; GE-
> WMC 2005-2 Prospectus Suppl. at S-27) (emphasis added).

63.     The Prospectus Supplements explained the importance of compliance with the

Underwriting Guidelines as a means of limiting the risk of loss:

> The Underwriting Guidelines are primarily intended to *(a) determine that the*
> *borrower has the ability to repay the mortgage loan in accordance with its terms*
> *and (b) determine that the related mortgaged property will provide sufficient*
> *value to recover the investment if the borrower defaults.*  (GE-WMC 2005-1
> Prospectus Suppl. at S-24; GE-WMC 2005-2 Prospectus Suppl. at S-27)
> (Emphasis added).

The Underwriting Guidelines specified "various risk categories" for borrowers and "associated

criteria for grading the potential likelihood that an applicant will satisfy the repayment

obligations of a mortgage loan."  GE-WMC 2005-1 Prospectus Suppl. at S-26; GE-WMC 2005-2

Prospectus Suppl. at S-29.

64.     In addition, with respect to the information evaluated by the originator WMC, the

Prospectus Supplement for each Securitization stated:

The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri-merge credit report[6] on the related applicant from a credit reporting company aggregator.  The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments.  In most instances, WMC Mortgage Corp. obtains a tri-merge credit score independent from the mortgage loan application from a credit reporting company aggregator.

Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.  (GE-WMC 2005-1 Prospectus Suppl. at S-24-25; GE-WMC 2005-2 Prospectus Suppl. at S-27-28).

65.    The Prospectuses further stated:

The underwriting guidelines are applied in accordance with a procedure which complies with applicable federal, state and local laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by an originator-approved appraiser or by the originator's in-house collateral auditors (who may be licensed appraisers), which audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.  (GE-WMC 2005-1 Prospectus at S-22; GE-WMC 2005-2 Prospectus at S-22).

66.    Contrary to these representations, however, WMC routinely and egregiously departed from, or abandoned completely, its stated underwriting guidelines, as discussed in Section IV.B, *infra*.  As a result, the representations concerning compliance with underwriting guidelines and the inclusion and descriptions of those guidelines in the Prospectus Supplements were false and misleading, and the actual mortgages underlying each Securitization exposed the

---

[6]    A tri-merge credit report is a credit report obtained from each of the three credit bureaus (Equifax, Experian, and TransUnion).

21

purchasers, including Freddie Mac, to a materially greater risk than that represented in the Prospectus Supplements.

67.     As reflected more fully in Appendix A, the Prospectus Supplements included representations that:  (i) the mortgage loans were underwritten in accordance with WMC's underwriting guidelines in effect at the time of origination, subject only to limited exceptions; and (ii) the origination and collection practices used by WMC with respect to each mortgage note and mortgage were in all respects legal, proper, and customary in the mortgage origination and servicing business.

68.     The inclusion of these representations in the Prospectus Supplements had the purpose and effect of providing assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations.  These representations were material to a reasonable investor's decision to purchase the Certificates, and they were material to Freddie Mac.  As alleged more fully below, these representations were materially false.

**B.      Occupancy Status of Borrower**

69.     The Prospectus Supplement for each Securitization set forth information about the occupancy status of the borrowers of the loans underlying the Securitization; that is, whether the property securing a mortgage is (i) the borrower's primary residence; (ii) a second home, or (iii) an investment property.  This information was presented in the Prospectus Supplements in a table entitled "Occupancy (All Mortgage Loans)."  This table assigned all the properties in the collateral group to one of the following categories:  (i) "Primary"; (ii) "Second Home"; or (iii) "Investment."  For each category, the table stated the number of loans purportedly in that

category.  Occupancy statistics for the Supporting Loan Groups for the Securitizations were

reported in the Prospectus Supplements as follows:[7]

**Table 4**

| Transaction | Supporting Loan Group | Primary | Second Home | Investment |
|---|---|---|---|---|
| GE-WMC 2005-1 | Group I | 91.48% | 5.37% | 3.15% |
| GE-WMC 2005-2 | Group I | 91.85% | 4.78% | 3.37% |

70.    As Table 4 makes clear, the Prospectus Supplement for each Securitization

reported that at least 90 percent of the mortgage loans in the Supporting Loan Groups were

owner occupied.

71.    Because information about occupancy status is an important factor in determining

the credit risk associated with a mortgage loan -- and, therefore, the Certificates that it backs --

the statements in the Prospectus Supplements concerning occupancy status were material to a

reasonable investor's decision to invest in the Certificates, and they were material to Freddie

Mac.  These statements were material because, among other reasons, borrowers who actually live

in mortgaged properties are substantially less likely to default and more likely to care for their

primary residence than borrowers who purchase properties as second homes or investments and

live elsewhere.  Accordingly, the percentage of loans in the collateral group of a securitization

that are secured by mortgage loans on owner-occupied residences is an important measure of the

risk of the Certificates sold in that Securitization.

72.    Other things being equal, the lower the percentage of loans secured by owner-

occupied residences, the greater the risk of loss to Certificateholders.  Even modest differences in

the percentages of primary/owner-occupied, second home/secondary, and investment properties

---

[7]    Each Prospectus Supplement provides the total number of loans and the number of loans
in the following categories:  primary; second home; and investment.  These numbers have been
converted to percentages for ease of comparison.

in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor regarding whether, and at what price, to purchase any such certificate. As discussed *infra* at paragraphs 85 through 90, the Prospectus Supplement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the Certificates purchased by Freddie Mac.

### C.   Loan-to-Value Ratios

73.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

74.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property. In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan or home-equity loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio. In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

75.     The LTV ratio is among the most important measures of the risk of a mortgage loan for several reasons. First, the LTV ratio is a strong indicator of the likelihood of default, because a higher LTV ratio makes it more likely that a decline in the value of a property will completely eliminate a borrower's equity, and will incentivize the borrower to stop making mortgage payments and abandon the property. Second, the LTV ratio is a strong predictor of the severity of loss in the event of a default, because the higher the LTV ratio, the smaller the "equity cushion," and the greater the likelihood that the proceeds of foreclosure will not cover the unpaid balance of the mortgage loan.

76.     Thus, the LTV ratios were material to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac.  Differences between the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that collateral groups will generate sufficient funds to pay certificateholders in that securitization.  Such differences are important to the decision of a reasonable investor regarding whether to purchase any such certificate, and they affect the intrinsic value of the certificate.

77.     The Prospectus Supplements for the Securitizations contained information about the LTV ratio for each Supporting Loan Group.  Table 5 below reflects two categories of important information reported in the Prospectus Supplements concerning the LTV ratios for each Supporting Loan Group:  (i) the percentage of loans with an LTV ratio of 80 percent or less; and (ii) the percentage of loans with an LTV ratio greater than 100 percent.[8]

**Table 5**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
| --- | --- | --- | --- |
| GE-WMC 2005-1 | Group I | 60.40% | 0.00% |
| GE-WMC 2005-2 | Group I | 61.37% | 0.00% |

78.     The LTV ratio is a material consideration to a reasonable investor deciding whether to purchase a certificate in a securitization of mortgage loans, and it was material to Freddie Mac.  Table 5 uses an LTV ratio of 80 percent as the benchmark because, as a condition for making a mortgage loan, lenders traditionally require borrowers to put down at least 20

---

[8]     As used in this Amended Complaint, "LTV" refers to the loan-to-value ratio for first lien mortgages and for properties with second liens subordinate to the lien included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

percent of the value of the property.  Accordingly, a down payment of at least 20 percent corresponds to an LTV ratio of less than or equal to 80 percent.  As Table 5 makes clear, the Prospectus Supplement for each of the Securitizations reported that the majority of mortgage loans in the Supporting Loan Group had an LTV ratio of 80 percent or less.  The Prospectus Supplements further stated that *none* of the Supporting Loan Groups contained a single loan with an LTV ratio over 100 percent. The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property in the absence of a mortgage insurance policy, and thus only lend 80 percent of the value of the property.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.

79.    As discussed *infra* at paragraphs 91 through 99, the Prospectus Supplements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk to Certificateholders.

**D.    Credit Ratings**

80.    Credit ratings are assigned to the tranches of mortgage-backed securities by the credit rating agencies, including Standard & Poor's, Moody's Investors Service, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for

recovery. At the time Freddie Mac purchased the Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent. Investments with BBB or its equivalent ratings historically experienced a loss rate of less than one percent. As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

81.    Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by analyzing the expected loss, factoring in "credit enhancements," such as subordination levels and excess spread, available to protect investors. Rating agencies determine, among other things, the likelihood of repayment of principal and interest based on the quality of the underlying mortgages by using sponsor-provided, loan-level data. Credit enhancements, such as subordination, represent the amount of "cushion," or protection from loss, incorporated into a given securitization.[9] This cushion is intended to improve the likelihood that holders of highly-rated certificates receive the interest and principal to which they are contractually entitled. The level of credit enhancement offered is based on the composition of the loans in the underlying collateral group and entire securitization. Riskier loans underlying the securitization necessitate higher levels of credit enhancement to ensure payment to senior Certificateholders. If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for a AAA or its equivalent rating.

---

[9]    "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior. The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first. These subordinate certificates thus provide a degree of protection to the senior certificates from certain losses on the underlying loans.

82.     For almost a hundred years, investors like pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.

83.     Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the Certificates purchased by Freddie Mac was always AAA or its equivalent.  The credit quality of the Certificates endorsed by these ratings was material to a reasonable investor's decision to purchase the Certificates, and it was material to Freddie Mac.  Among other things, the ratings provided additional assurance that investors in the Certificates would receive the expected interest and principal payments.  As set forth, *infra* at paragraph 133, the ratings for the Securitizations were downgraded after Freddie Mac's purchase of the Certificates.  Upon information and belief, the initial ratings were based in substantial part upon the materially inaccurate and incomplete information in the Registration Statement and related information provided to the rating agencies.

## IV.     FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS

### A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner-Occupancy and Loan-To-Value Ratios Was Materially False or Misleading

84.     A review of loan-level data for a sample of mortgage loans in each Securitization was conducted to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the review included an analysis either of:  (i) a sample of 1,000 loans randomly selected from the Supporting Loan Group; or (ii) all the loans in the Supporting Loan Group, if there were fewer than 1,000 such loans.  The review of the sample data has confirmed, on a statistically-significant basis, that the data

provided in the Prospectus Supplements concerning owner-occupancy and LTV ratios was materially false and misleading at the time the loans were originated and securitized, and that the Prospectus Supplements contained material misrepresentations with respect to the underwriting standards employed by the originator and of certain key characteristics of the mortgage loans across the Securitizations at the time of their origination.

### 1.   Owner-Occupancy Data Was Materially False or Misleading

85.    The data review reveals that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of loan origination. Indeed, the Prospectus Supplements over-reported the number of underlying properties that were occupied by their owners, and underreported the number of underlying properties held as second homes or investment properties.

86.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether the borrower's tax bill was being mailed to the mortgaged property or to a different address six months after the loan closed, whether the borrower had claimed an owner-occupied tax exemption on the mortgaged property, and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests constitutes strong evidence that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, rendering it much more likely that a borrower will not repay the loan.

87.    For each Securitization, a significant number of the underlying loans failed two or more of these tests, demonstrating that the owner-occupancy statistics provided to Freddie Mac were materially false and misleading.  For example, the Prospectus Supplement for the GE-WMC 2005-2 Securitization -- for which GE Mortgage Holding was the sponsor and Credit

Suisse was the underwriter -- stated that 8.15 percent of the underlying properties, by loan count, in the Supporting Loan Group were not owner occupied.  But the data review revealed that the true percentage of non-owner-occupied properties was 20.39 percent,[10] over 250 percent greater than the percentage reported in the Prospectus Supplement, because, for 13.33 percent of the properties represented as owner occupied, the owners lived elsewhere.

88.     The data review revealed that, for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner-occupied properties.  The true percentage of non-owner-occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization, is reflected in Table 6 below.

**Table 6**

| Transaction | Supporting Loan Group | A Reported Percentage of Non-Owner-Occupied Properties | B Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner-Occupancy | C Actual Percentage of Non-Owner-Occupied Properties | D Prospectus Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| GE-WMC 2005-1 | Group I | 8.52% | 12.78% | 20.21% | 11.69% |
| GE-WMC 2005-2 | Group I | 8.15% | 13.33% | 20.39% | 12.24% |

89.     Table 6 demonstrates that the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner-occupied properties by *more than half*.  The inclusion of inaccurate statistics in its Prospectus Supplements was misleading because the GE Depositor, the GE Sponsor, and the Underwriter Defendants endorsed the accuracy of such statistics through the inclusion of their names on the document and their express statements in the Prospectus Supplements that investors "should rely on the information contained in this

---

[10]     The true percentage of non-owner-occupied properties (Table 6 Column C) is calculated by adding (a) the percentage reported in the Prospectus Supplement (Table 6 Column A) to (b) the product of (i) the percentage of owner-occupied properties reported in the Prospectus Supplement (100 minus Column A) and (ii) the percentage of properties reported as owner-occupied, but with strong indication of non-owner occupancy (Table 6 Column B).

prospectus supplement and the accompanying prospectus.  We have not authorized anyone to provide you with different information."  (GE-WMC 2005-1 Prospectus Suppl. at i).

90.     Specific examples of misrepresentations and omissions showing that the owner occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of origination are discussed in detail below.  *See infra* at paragraph 112.  Forensic loan reviews reaffirm what the above statistics demonstrate:  the owner occupancy data in the Prospectus Supplements was materially false at the time of origination.

## 2.     Loan-to-Value Data Was Materially False

91.     The data review has further revealed that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated at the time the loans were originated and securitized, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  AVMs rely upon data similar to that upon which appraisers rely -- primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation, repeat sales indices, and regression analysis, relying on the sales made within the last 24 months prior to the origination of the mortgage loan at issue.

92.     Application of the VP4 AVM to the available data for the properties securing the sampled loans shows that the original appraised value given to such properties was significantly higher than the actual value of the properties as determined by the VP4 retroactive AVM.  The result of this overstatement of property values is a material understatement of LTV.  That is, if a

property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value. This, of course, increases the risk that a borrower will not repay the loan and the risk of greater losses in the event of a default. As stated in the Prospectus Supplement for GE-WMC 2005-1: "Certain of the mortgage loans may have high loan-to-value ratios or combined loan-to-value ratios, so that the related borrower has little or no equity in the related mortgage property, which may result in losses with respect to these mortgage loans allocated to your certificates." (GE-WMC 2005-1 Prospectus Suppl. at S-9).

93.     The Prospectus Supplement for the GE-WMC 2005-1 Securitization stated: "No mortgage loan purchased by the trust will have a loan-to-value ratio or combined loan-to-value ratio, as applicable, exceeding 100% at origination." In fact, however, 11.86 percent of the sample of loans included in the data review had LTV ratios above 100 percent. In addition, the Prospectus Supplement stated that 60.40 percent of the loans had LTV ratios at or below 80 percent. The data review, however, indicated that only 42.58 percent of the loans had LTV ratios at or below 80 percent.

94.     The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well as the percentage of loans that had an LTV ratio at or below 80 percent at the time of their origination. Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios at or below 80 percent, versus the percentage reported in the

Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregate principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At Or Less Than 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At Or Less Than 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| GE-WMC 2005-1 | Group I | 60.40% | 42.58% | 0.00% | 11.86% |
| GE-WMC 2005-2 | Group I | 61.37% | 38.89% | 0.00% | 15.45% |

95.     As Table 7 demonstrates, the Prospectus Supplement for each Securitization falsely reported that *none* of the mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.  The data review, however, revealed that more than 11 percent of the mortgages in the Supporting Loan Group for each Securitization had a true LTV ratio over 100 percent.  In addition, the data review revealed that less than half of the loans in the Supporting Loan Groups for each Securitization had LTV ratios at or less than 80 percent.

96.     These systemic misrepresentations with respect to reported LTV ratios also demonstrate that the representations and warranties in the Registration Statements relating to appraisal practices were false, and that the appraisers routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that, as demonstrated by Table 7, deviate so significantly (and so consistently upward) from the true values of the appraised properties.  These consistent errors demonstrate that, contrary to the representations in the Prospectuses and Prospectus Supplements, the appraisers

did not comply with the Uniform Standards of Professional Appraisal Practice, but instead generated inflated appraisal values merely to justify the issuance of a mortgage loan.

97.     This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission ("FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results. (*See* Financial Crisis Inquiry Commission, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report"), at 91-92.

98.     Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century. Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income. (See Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.)

99.     Ms. Lindsay also testified that appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." (See Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.) Indeed, on May 7, 2007, The Washington Post reported that a former New Century appraiser, Maggie Hardiman, recounted how she "didn't want to turn away a loan because all hell would break loose" and that, when she did reject a loan, "her bosses often overruled her and found another appraiser to sign off on it." (David Cho,

Pressure at Mortgage Firm Led to Mass Approval of Bad Loans, The Washington Post (May 7, 2007).)

**B.      The Originator of the Underlying Mortgage Loans
         Systematically Disregarded Its Underwriting Guidelines**

100.     The Prospectus Supplements each contained numerous material misstatements and omissions concerning the underwriting guidelines used by WMC, the Non-Party Originator of the loans included in the Securitizations.  Among other things, the Prospectus Supplements stated that WMC underwrote all loans in compliance with its underwriting guidelines.  WMC, however, systematically disregarded its underwriting guidelines as confirmed not only by the pervasively false owner-occupancy and LTV figures, alleged *supra*, but also by:  (1) a forensic review of loan files; (2) government investigations and private actions relating to WMC's underwriting practices, which have revealed widespread abandonment of reported underwriting guidelines during the period of the Securitizations; (3) the decline in the Certificates' credit ratings; and (4) the surge in delinquencies and defaults in the mortgages in the Securitizations.

**1.      A Forensic Review of Loan Files Has Revealed
         Pervasive Failure to Adhere to Underwriting Guidelines**

101.     An initial forensic review of 48 loans from the Supporting Loan Group of the GE-WMC 2005-1 Securitization has revealed that approximately 98 percent of the reviewed loans had not been underwritten in accordance with the applicable underwriting guidelines.  A forensic review of 65 loans from the Supporting Loan Group of the GE-WMC 2005-2 Securitization has revealed that approximately 95 percent of the reviewed loans had not been underwritten in accordance with the applicable underwriting guidelines.

102.     The forensic review consisted of an analysis of the loan origination file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as borrowers'

filings in bankruptcy proceedings, motor vehicle registration, or other documentation available at the time of the loan application with pertinent information indicating a borrower's assets or residence.

103.   The mortgage loans in the GE-WMC 2005-1 and GE-WMC 2005-2 were originated or acquired from WMC.

104.   With respect to the information evaluated in the loan application, the Prospectus Supplements for the GE-WMC 2005-1 and GE-WMC 2005-2 Securitizations state:

> Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model. (GE-WMC 2005-1 Prospectus Suppl. at S-24; GE-WMC 2005-2 Prospectus Suppl. at S-27).

105.   Both Prospectus Supplements further state:

> The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri-merge credit report on the related applicant from a credit reporting company aggregator. The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. (GE-WMC 2005-1 Prospectus Suppl. at S-24–S-25; GE-WMC 2005-2 Prospectus Suppl. at S-27–S-28).

106.   The results of the forensic review, however, demonstrate the material falsity of the disclosures in the Registration Statements stating that the mortgage loans were underwritten

in accordance with the applicable underwriting guidelines described in the Prospectus
Supplements.

107.    The WMC guidelines that were disregarded were designed to assess the
likelihood a borrower would be able to repay the loan.  The forensic review revealed
abandonment of underwriting guidelines, including as follows:

- failure to test the reasonableness of the borrower's stated income contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject properties when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended for investment;

- failure to calculate properly the borrower's outstanding debt-to-income ratio ("DTI"), resulting in DTI exceeding the maximum allowed under the underwriting guidelines; and

- failure to investigate properly information on the borrower's credit reports of potential misrepresentations of outstanding or potential debt.

Although the Prospectus Supplements represented that exceptions would be justified by
sufficient compensating factors, none of the loans files reflecting a breach of underwriting
guidelines evidenced valid exceptions consistent with the exception process outlined in the
underwriting guidelines.  Similarly, the loan files lack any documentation reflecting whether or
how the originators considered, if at all, such compensating factors.  A 98 percent breach rate for
the GE-WMC 2005-1 Securitization and a 95 percent breach rate for the GE-WMC 2005-2
Securitization, in any event, could not possibly be explained by the proper application of any
such exceptions.

108.    The following examples from the forensic review of the GE-WMC 2005-1 and
GE-WMC 2005-2 Securitizations illustrate the types of breaches discussed above that pervade
the loan pools for these Securitizations.

### a.     Stated Income Was Not Reasonable

109.    The applicable underwriting guidelines required the underwriter to verify the

employment listed by the borrower on the application and to assess whether the stated income

was reasonable given the applicant's line of work.  The applicable underwriting guidelines

provided:

> In the case of mortgage loans originated under the Full Documentation category,
> the Underwriting Guidelines require documentation of income (which may
> consist of (1) a verification of employment form covering a specified time period
> which varies with LTV, (2) two most recent pay stubs and two years of tax returns
> or W-2s, (3) verification of deposits and/or (4) bank  statements) and telephonic
> verification. . . .
>
> For mortgage loans originated under the Stated Income/Verified  Assets
> (Streamlined) Documentation category, WMC Mortgage Corp. requires
> verification of funds equal to two months of principal, interest, taxes and
> insurance, sourced and seasoned for at least sixty days.  In the case of mortgage
> loans originated under the Stated Income Documentation and Stated
> Income/Verified Assets  (Streamlined) Documentation categories, the
> Underwriting Guidelines require (1) that income be stated on the application,
> accompanied by proof of self employment in the case of self-employed
> individuals, (2) that a WMC Mortgage Corp. pre-funding auditor conduct
> telephonic verification of employment, or in the case of self-employed
> individuals, telephonic verification of business line and (3) that stated income be
> consistent with type of work listed on the application.  (GE-WMC 2005-1
> Prospectus Suppl. at S-25; GE-WMC 2005-2 Prospectus Suppl. at S-28).

110.    The following examples reveal instances where there was no evidence that the

underwriter analyzed the reasonableness of the borrower's stated income for the employment

listed on the loan application, as required by the applicable underwriting guidelines.  In fact, the

forensic review verified that the borrower misrepresented his or her income on the application.

This misrepresentation resulted in a miscalculation of the borrower's DTI.  Had the loan

underwriter performed an evaluation of the income stated on the application by the borrower, as

required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated

income would have been evident.

- A loan that closed in June 2005 with a principal balance of $192,000 was originated by WMC as a Stated Income/Verified Assets loan. The loan application stated that the borrower was employed as a customer service representative, earning $7,520 per month, and that the co-borrower was employed as a parts associate, earning $3,500 per month. The borrower's stated income exceeded the Bureau of Labor Statistics 90th percentile salary for a customer service representative in the same geographic region during the same period, which should have put a reasonably prudent underwriter on notice that the borrower's income was overstated. Moreover, based on a Statement of Financial Affairs filed by the borrower as part of a later bankruptcy proceeding, the 2005 combined income of the borrower and co-borrower was actually $4,333 per month. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on borrowers' verified income yields a DTI of 116.88 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted, resulting in a loss of $15,635.

- A loan that closed in July 2005 with a principal balance of $40,000 was originated by WMC as a Stated Income/Verified Assets loan. The loan application stated that the borrower was employed as a hotel supervisor, earning $4,500 per month. The borrower's stated income exceeded the Bureau of Labor Statistics 90th percentile salary for a hotel supervisor in the same geographic region during the same period, which should have put a reasonably prudent underwriter on notice that the borrower's income was overstated. Moreover, according to the borrower's 2007 W-2, the borrower's income was actually $1,664 per month. From the time the loan closed until at least 2007, the borrower was employed by the same employer in the same line of work. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on borrowers' verified income yields a DTI of 109.31 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted, resulting in a loss of $41,132.

- A loan that closed in October 2005 with a principal balance of $267,200 was originated by WMC Mortgage Corp. as a Full Documentation loan. The loan application stated that the borrower was self-employed as the owner of a cleaning business earning $6,750 a month. The borrower's stated income exceeded the Bureau of Labor Statistics 90th percentile for an owner of a cleaning business in the same geographic region during the same period, which should have put a reasonably prudent underwriter on notice that the borrower's income was overstated. Moreover, post-closing documentation, including the borrower's 2006 Federal Carryover Worksheet from the 2006 tax returns, revealed that the borrower's 2005 monthly income was actually $2,161. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on the borrowers' verified income yields a DTI of 155.89 percent, which exceeds the

39

guideline maximum allowable DTI of 50 percent.  The loan defaulted and the property was liquidated, resulting in a loss of $108,069.

- A loan that closed in October 2005 with a principal balance of $39,000 was originated by WMC Mortgage Corp. as a Full Documentation loan.  The loan application stated that the borrower was employed by three different employers as a senior mental health counselor earning a combined monthly income of $6,021.  The Financial Information Sheet attached to the contract and signed by the borrower provided income data for the borrower's first and second employers.  However, the monthly income from the second employer was $315 less than that listed on the loan application, and the Financial Information Sheet did not reflect a third employer or third income, resulting in a decrease in the borrower's monthly income to $5,333.  There is no evidence in the file that the underwriter tested the reasonableness of the stated income.  A recalculation of DTI based on all the evidence discovered during the forensic loan file review yields a DTI of 105.55 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $41,252.

111.    Accordingly, the results of the forensic review demonstrate that the statements in the Registration Statements concerning the originators' verification of the reasonableness of the stated income were materially false and misleading.  In particular, a number of mortgage loans were made on the basis of "stated incomes" that were facially unreasonable, and were not properly underwritten through efforts to verify the reasonableness of the borrowers' income.

### b.    Evidence of Occupancy Misrepresentations

112.    The following is an example from the forensic review where the loan underwriters did not adequately question the borrower's intended occupancy of the subject property.

- A loan that closed in July 2005 with a principal balance of $132,720 was originated by WMC as a Stated Income/Verified Assets loan.  The loan was represented for an owner-occupied residence. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property.  The borrowers never activated utilities at the subject property. The borrowers bought another property a month after closing on the subject property, and turned on utilities at this property.  Furthermore, in a 2007 bankruptcy proceeding, the borrowers indicated that their residence at the time of origination was their current residence, not the address of the subject property.  There is no evidence in the loan file that the loan underwriter addressed or challenged the borrowers' claim that they intended to reside at the new location.  The loan defaulted, resulting in a loss of $80,489.

40

### c.    Debts Incorrectly Calculated; DTI Exceeded Guidelines

113.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan.  The applicable underwriting guidelines, as described in the Prospectus Supplements for both the GE-WMC 2005-1 and GE-WMC 2006-1, stated that:

> Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and *calculates the Debt Ratio to determine the applicant's ability to repay the loan.*  (GE-WMC 2005-1 Prospectus Suppl. at S-24; GE-WMC 2005-2 Prospectus Suppl. at S-27) (emphasis added).

114.    The Prospectus Supplements further provided that "[u]nder the Underwriting Guidelines, various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the conditions of the mortgage loan.  These risk categories establish . . . the borrower's debt ratio."  (GE-WMC 2005-1 Prospectus Suppl. at S-26; GE-WMC 2005-2 Prospectus Suppl. at S-29).  The borrower's monthly debt obligations are paramount in determining whether the borrower has the ability to repay a loan according to its terms.

115.    The following are some examples where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated.  When properly calculated, the borrower's actual DTI exceeded the limits established by the applicable underwriting guidelines.  The failure to properly calculate debt led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed in July 2005 with a principal balance of $213,600 was originated by WMC as a Stated Income/Verified Assets loan.  A forensic review of the loan file reveals that the borrower obtained two undisclosed mortgages the month prior to the subject loan closing, which resulted in additional monthly payments of $2,443.  Although these loans were not listed in the application for the subject loan, there were five credit inquiries, including two mortgage-related inquiries, listed on the origination credit report for the previous 90 days.  A recalculation of the DTI that includes the

borrower's undisclosed debt results in an increase in DTI from 48.47 percent to 95.14 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $160,034.

- A loan that closed in July 2005 with a principal balance of $136,000 was originated by WMC as a Stated Income/Verified Assets loan.  A credit report included in the origination file dated prior to closing shows five credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to determine whether the borrower had any undisclosed liabilities.  The forensic credit report showed that the borrower had two auto loans with total monthly payments of $1,097, which were outstanding prior to the closing of the subject loan.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 64.69 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted, resulting in a loss of $130,611.

- A loan that closed in July 2005 with a principal balance of $124,000 was originated by WMC as a Full Documentation loan.  A forensic review of the loan file reveals that the borrower obtained two undisclosed mortgages in the same month as the subject property, which resulted in additional monthly payments of $1,746.  Although these loans were not listed on the application for the subject loan, there were 10 credit inquiries listed on the origination credit report for the previous 90 days.  There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan.  A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase in DTI from 39.27 percent to 78.34 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $154,298.

### d.  Credit Inquiries That Indicated Misrepresentations of Debts

116.  The Prospectus Supplements for the GE-WMC 2005-1 and GE-WMC 2005-2

Securitizations provide:

> The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri-merge credit report on the related applicant from a credit reporting company aggregator.  The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments.  (GE-WMC 2005-1 Prospectus Suppl. at S-25; GE-WMC 2005-2 Prospectus Suppl. at S-28).

117.    The following examples are instances where the borrowers' credit reports contained numerous credit inquiries that should have put the loan underwriters on notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI.  In each of these instances, there was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquires were not indicative of undisclosed liabilities of the borrower.  Had the loan underwriter properly addressed these irregularities, the undisclosed liabilities could have been discovered.  Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to make timely payments on the mortgage loan.

- A loan that closed in November 2005 with a principal balance of $67,200 was originated by WMC Mortgage Corp. as a Stated Income/Verified Assets loan. A credit report included in the origination file dated prior to closing shows 47 credit inquiries within the past 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, the borrower obtained two undisclosed mortgages prior to the subject closing, which resulted in additional monthly payments of $4,126.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 162.85 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $70,920.

- A loan that closed in July 2005 with a principal balance of $118,400 was originated by WMC as a Full Documentation loan.  A credit report included in the origination file dated prior to closing shows eight credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, the borrower obtained an auto loan prior to the closing of the subject loan, which resulted in an additional monthly payment of $337.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 64.25 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $37,022.

- A loan that closed in July 2005 with a principal balance of $124,000 was originated by WMC as a Full Documentation loan.  A credit report included in the origination file dated prior to closing shows 10 credit inquiries within the

43

previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained an additional two mortgage loans in the same month the subject loan closed.  A recalculation of the DTI based on all evidence uncovered in the forensic review yields a DTI of 78.34 percent, which exceeds the guideline maximum allowable DTI of 50 percent.  The loan defaulted, resulting in a loss of $154,298.

> **2.    Both Government and Private Investigations Confirm That the Originator of the Loans in the Securitizations Systematically Failed to Adhere to Its Underwriting Guidelines**

118.    An extraordinary volume of publicly-available information, including government reports and investigations, confirms that WMC abandoned its loan underwriting guidelines throughout the period of the Securitizations.

119.    WMC, which originated the loans for each of the Securitizations, employed reckless underwriting standards and practices, as described more fully below, that resulted in a large number of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. (*See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.)  General Electric, which had purchased WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year, which included WMC's loss  (*See, e.g.*, Diane Brady, *Adventures of a Subprime Survivor*, Bloomberg Businessweek, Oct. 29, 2007 (available at http://www.businessweek.com/magazine/content/07_44/b4056074.htm).)

120.    WMC's reckless loan origination practices attracted the attention of regulatory authorities.  In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services, filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect

Investigation Fees (the "Statement of Charges") against WMC and its principal owners individually. (*See* Statement of Charges, No. C-07-557-08-SC01, June 4, 2008.) The Statement of Charges included 86 loan files, which revealed that at least 76 loans were defective or otherwise in violation of Washington State law. (*Id.*) Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers, and committed many other violations of Washington State deceptive and unfair practices laws. (*Id.*)

121.   On January 20, 2012, the L.A. Times reported that the FBI and Justice Department have been investigating possible fraud at WMC. According to the L.A. Times report: "[t]he government is asking whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans"; "[t]he FBI's San Francisco office . . . has been looking into WMC's business practices for nearly two years"; and "[t]he bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sales of mortgages to investors." (Michael Hudson and E. Scott Reckard, *GE Lending Unit Said to Be Target of U.S. Probe,* L.A. Times, January 20, 2012, available at http://articles.latimes.com/2012/jan/20/business/la-fi-mortgage-probe-20120120, last accessed on June 13, 2012.)

122.   Former WMC employees have also come forward -- in interviews with *iWatch News,* which acts as an online publication dedicated to investigative and accountability reporting for the Center for Public Integrity, one of the oldest and largest non-partisan, non-profit investigative news organizations -- and provided overwhelming, first-hand evidence that WMC not only abandoned its underwriting standards and practices, but that WMC and its employees

engaged in out-and-out fraud to increase profits and commissions. Dave Riedel, a former

compliance manager at WMC who supervised a quality-control team of a dozen or more people

in Southern California, told *iWatch News* that WMC "sales reps intent on putting up big numbers

used falsified paperwork, bogus income documentation and other tricks to get loans approved

and sold off to Wall Street investors." (Michael Hudson, *Fraud and folly: The untold story of

General Electric's subprime debacle*, iWatch News, January 6, 2012, last updated January 23,

2012, available at http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-

general-electric-s-subprime-debacle.)[11]

123.     Riedel and his team uncovered numerous examples of fraud committed by WMC

employees. "These included faking proofs of loan applicants' employment and faking

verifications that would-be home buyers had been faithfully paying rent for years rather than,

say, living with their parents. Some employees also fabricated borrowers' incomes by creating

bogus W-2 tax forms . . . ." In 2005, Riedel and his team became particularly concerned about a

sales manager who oversaw the funding of hundreds of loans each month. Riedel told *iWatch

News* that "[a]n audit of these loans . . . found that many of the deals showed evidence of fraud

or other defects such as missing documents." Riedel brought these concerns to WMC's

management, which took no disciplinary action against the sales manager.

124.     Later, Riedel informed a visiting GE compliance official of the audit and of

WMC's failure to respond. As apparent payback for alerting management to the fraud he

uncovered, Riedel lost his office and staff and was demoted. A former WMC executive, who

spoke with *iWatch News* on the condition of anonymity, stated that although WMC may have

---

[11]     Paragraphs 122 through 128 of the Complaint refer to or quote directly from the
*iWatch News* report.

been prevented from firing Riedel because GE knew of Riedel's fraud concerns, "it didn't stop [WMC] from putting [Riedel] into corporate limbo . . . . 'They just marginalized him and he didn't really have anything to do.'"

125.    In May of 2006, Riedel presented GE officials with results of an internal audit of loans that investors had asked WMC to repurchase, which indicated that "78 percent of them had been fraudulent" and "nearly four out of the five loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment." Upon information and belief, WMC made no changes to its origination practices, procedures, or internal control in response to Riedel's presentation.

126.    Gail Roman, a former loan auditor at WMC's regional offices in Orangeburg, N.Y., informed *iWatch News* that she "dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications," but "[m]anagement ignored [her] reports and approved the loans anyway." Roman reported that WMC "didn't want to hear what you found . . . [e]ven if you had enough documentation to show that there was fraud or questionable activity."

127.    Victor Argueta, a former risk analyst at WMC, told *iWatch News* that "one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved." These documents included bank statements, W-2s and "'[a]nything to make the loan look better than what was the real story.'" In another instance, Argueta reported to management that certain salespeople "were putting down fake jobs on borrowers' loan applications" and "listing their own cell phone numbers so they could pose as the borrowers' supervisors and 'confirm' that the borrowers were working at the made-up employers." Despite's Argueta's report, WMC's management took no action against the offending salespeople.

128. Confidential witnesses independent of the WMC employees interviewed by *iWatch* further corroborate the *iWatch News* reports that WMC abandoned its underwriting guidelines completely. One confidential witness, an underwriter at WMC during the time of the Securitizations, described WMC as being "pretty crooked." The witness stated that originators knew that brokers were altering documents needed for the loan application, such as bank statements. The witness recounted that a broker from Florida routinely presented fraudulent documents, which would prompt her team to reject his brokered applications; however, the Florida broker would circumvent the denials by escalating the applications to upper management, which would approve the loans.

129. A second confidential witness, an underwriter at WMC during the time of the Securitizations, expressed doubts about the quality of the loans, to the point that, in many instances, the witness did not feel comfortable putting the witness's name on an approval. In such instances, the loan application would be directed to a manager at a higher level, because "there was always someone who could paint a pretty picture out of any scenario." This witness said he caught material misrepresentations or fraud on a daily basis and was surprised they were never brought to the attention of law enforcement. The witness elaborated on a particularly egregious occurrence where the witness discovered that the buyer was related to the loan officer or the appraiser and that the subject properties were being appraised for three times their value. The witness asserted that management at WMC "swept it under a rug." The conflict issue was not addressed.

### 3. The Decline in the Certificates' Credit Ratings Further Shows that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

130.    The decline in the credit ratings of the Certificates invested in by Freddie Mac is further evidence of the originator's systematic disregard of underwriting guidelines, underscoring that these Certificates were impaired from the start.

131.    The Certificates purchased by Freddie Mac originally were assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements.  Those ratings artificially were inflated, however, upon information and belief in part as a result of the same misrepresentations that the Defendants made to investors in the Prospectus Supplements.

132.    Upon information and belief, Defendants provided or caused to be provided loan-level information, including LTV ratios, owner-occupancy status, and other loan characteristics, to the rating agencies.  The rating agencies in turn relied on this information to assign the Certificates credit ratings.  Upon information and belief, because the information that Defendants provided or caused to be provided was materially false, the models used by the rating agencies under-predicted the likelihood of delinquency and loss, as well as the loss severity.  As a result of the false information provided, the Securitizations lacked the level of subordination required for the Certificates to be rated AAA (or its equivalent), and investors, including Freddie Mac, were deprived of the level of protection commensurate with a AAA (or equivalent) rating.  As a result, the Certificates were offered and purchased at prices suitable for AAA investment grade securities, when in fact the Certificates actually carried a severe risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).  As of April 2012, the ratings for the A1 tranche of the GE-WMC 2005-1 and GE-WMC 2005-2 Securitizations were A2/AAA/A and B2/BB/CCC, respectively.

133.    Freddie Mac could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, April 2010.  This was the first date on which any of the Certificates at issue was downgraded below investment grade by a credit ratings agency.  Prior to the downgrade in April 2010, Freddie Mac had insufficient reason to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements relating to its Certificates.

### 4.    The Surge in Mortgage Delinquency and Default Further Demonstrates That the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

134.    Even though the Certificates were marketed as long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of Certificates is a direct consequence of the fact that their underlying mortgage loans were not underwritten in accordance with applicable underwriting guidelines as represented in the Prospectus Supplements.

135.    Loan groups that were underwritten properly and contained loans with the characteristics represented in the Prospectus Supplements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 8 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of April 2012.

**Table 8**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| GE-WMC 2005-1 | Group I | 47.0% |
| GE-WMC 2005-2 | Group I | 39.8% |

136.    The confirmed misstatements concerning owner-occupancy and LTV ratios, the confirmed systematic underwriting failures by the originator responsible for the mortgage loans across the Securitizations, and the drop in credit ratings and rise in delinquencies across those Securitizations all indicate that mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements were not originated in accordance with the stated underwriting guidelines.

## V.    FREDDIE MAC'S PURCHASE OF THE CERTIFICATES

137.    Between September 28, 2005 and December 19, 2005, Freddie Mac purchased over $549 million in Certificates issued in connection with the Securitizations. Table 9 reflects each of Freddie Mac's purchases of the Certificates.[12] To date, Freddie Mac has not sold any of the Certificates.

**Table 9**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| GE-WMC 2005-1 | A1 | 367910AA4 | 09/28/05 | 230,365,000.00 | 100 | MS&Co. |
| GE-WMC 2005-2 | A1 | 367910AR7 | 12/19/05 | 319,314,000.00 | 100 | Credit Suisse |

## VI.    FREDDIE MAC WAS DAMAGED BY DEFENDANTS' VIOLATIONS OF LAW

138.    The statements and information in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the Certificates, and the origination and underwriting practices pursuant to which the mortgage loans purportedly were

---

[12]    Purchases and holdings of Certificates in Table 9 are stated in terms of unpaid principal balance ("UPB") of the relevant Certificates. Purchase prices are stated in terms of percentage of par.

originated, were material to a reasonable investor. Defendants were responsible for the contents of the Registration Statements. But for the misrepresentations and omissions in the Registration Statements concerning those matters, Freddie Mac would not have purchased the Certificates.

139.    Based upon sales of the Certificates or similar certificates in the secondary market, or other indications of value, Freddie Mac has incurred substantial losses on the Certificates due to a decline in value that is directly attributable to Defendants' material misrepresentations and omissions. Among other things, the mortgage loans underlying the Certificates experienced defaults and delinquencies at a higher rate than would have been the case had the loans underlying the Certificates actually conformed to the origination underwriting guidelines, and had the Certificates merited the credit ratings set forth in the Registration Statements.

140.    Defendants' misstatements and omissions in the Registration Statements were the direct, proximate, and actual cause of Freddie Mac's losses resulting from its purchase of the Certificates. Among other things, it was foreseeable to Defendants that non-compliant loans would suffer higher incidents of delinquency and default than loans underwritten in accordance with the originator's underwriting standards. Although clearly significant, the precise extent of Freddie Mac's injuries will be proven at trial.

141.    At the time it purchased the Certificates, Freddie Mac was unaware of Defendants' misrepresentations, omissions, and/or untrue statements. Plaintiff was appointed Conservator of Freddie Mac less than one year after the discovery of the untrue statements and omissions contained in the Registration Statements and within three years of the Certificates being offered for sale to the public. Despite the exercise of reasonable diligence, Freddie Mac could not reasonably have discovered the untrue statements and omissions in the Registration

Statements more than one year prior to the appointment of the Plaintiff as Conservator.  This action is timely pursuant to 12 U.S.C. §§ 4617(b)(12) and (13), which establishes all time periods applicable to the claims brought herein.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against GE-WMC Mortgage Securities, Credit Suisse, and MS&Co.)

142.    Plaintiff realleges paragraphs 1 through 141 above as if fully set forth herein.

143.    This claim is brought by FHFA pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued pursuant to the Registration Statements for the Securitizations listed in paragraph 41.

144.    This claim is for strict liability based on the material misstatements and omissions in the Registration Statements that registered securities that were *bona fide* offered to the public on or after September 6, 2005 (as specified in Table 1, *supra* at paragraph 34), and is asserted against GE-WMC Mortgage Securities, Credit Suisse, and MS&Co.

145.    The Underwriter Defendants directly and indirectly participated in distributing the Certificates, and directly and indirectly participated in drafting and disseminating the Registration Statements, which registered securities that were *bona fide* offered to the public on or after September 6, 2005.  As such, they are strictly liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

146.    The GE Depositor filed the Shelf Registration Statement (as specified in Table 2, *supra* at paragraph 41) pursuant to which the Securitizations were carried out.  As depositor, the GE Depositor is the "issuer" of the Certificates issued pursuant to the Registration Statements within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, the GE Depositor is liable under

Section 11 for the misstatements and omissions in the Registration Statements, which registered securities that were *bona fide* offered to the public on or after September 6, 2005.

147.   At the time that they became effective, each of the Registration Statements, as set forth above, contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated or omitted were material to a reasonable investor in the Certificates sold pursuant to the Registration Statements.

148.   The untrue statements of material facts and omissions of material fact in the Registration Statements are principally those set forth above in Sections III and IV and Appendix A, and pertain to purported compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and credit ratings.

149.   Freddie Mac purchased or otherwise acquired the Certificates pursuant to the false and misleading Registration Statements, and made these purchases in the primary market.  At the time it purchased the Certificates, Freddie Mac was unaware of the false and misleading statements and omissions alleged herein, and if it had known those facts, it would not have purchased the Certificates.

150.   As underwriters, the Underwriter Defendants were obligated to make a reasonable investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

151.   The Underwriter Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration

Statements filed in connection with the Securitizations, as set forth herein.  In addition, although the performance of due diligence is not an affirmative defense available to the GE Depositor on this strict liability claim, the GE Depositor nonetheless also failed to take reasonable steps to ensure the accuracy of the representations made in the Registration Statements.

152.    By virtue of the foregoing, Freddie Mac sustained substantial damages, including depreciation in the value of the Certificates, as a result of the misstatements and omissions in the Registration Statements.  Plaintiff is therefore entitled to damages, jointly and severally, from each of the GE Depositor and Underwriter Defendants.

153.    Based on the foregoing, each of the GE Depositor and Underwriter Defendants is jointly and severally liable for its wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against GE-WMC Mortgage Securities, Credit Suisse, and MS&Co.)

154.    Plaintiff realleges each allegation paragraphs 1 through 153 above as if fully set forth herein.

155.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued pursuant to the Registration Statements for the Securitizations listed in paragraph 41.

156.    The Underwriter Defendants are prominently identified as underwriters in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to together as the "Prospectuses").  The Underwriter Defendants offered, promoted, and/or sold the Certificates publicly, including selling to Freddie Mac, as set forth in the "Method of Distribution" section of the Prospectuses.  The Underwriters offered, promoted, and/or sold the Certificates to Freddie Mac as specified in Table 9, *supra* at paragraph 137.

55

157.   The Underwriter Defendants offered, promoted, and/or sold the Certificates to Freddie Mac by means of the Prospectuses that contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  The Underwriter Defendants successfully solicited Freddie Mac's purchases of the Certificates, and generated millions of dollars in commissions in connection with the sale of the Certificates.

158.   The Underwriter Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

159.   The GE Depositor is prominently identified in the Prospectuses for the Securitizations carried out pursuant to the Registration Statements that it filed.  These Prospectuses were the primary documents used to sell the Certificates for the securitizations under those Registration Statements.  The GE Depositor, a statutory seller, offered the Certificates publicly and actively solicited their sale, including to Freddie Mac, for its own benefit and the benefit of GE.

160.   The GE Depositor offered the Certificates to Freddie Mac by means of Prospectuses that contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, the GE Depositor reviewed and participated in drafting the Prospectuses.

161.   The GE Depositor offered the Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

162.    The GE Depositor and the Underwriter Defendants actively participated in the solicitation of Freddie Mac's purchase of the Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and/or assisting in marketing and selling the Certificates.

163.    Each of the Prospectuses contained material misstatements of facts and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

164.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Sections III and IV and Appendix A, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and credit ratings.

165.    The GE Depositor and the Underwriter Defendants offered and sold the Certificates directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

166.    GE-WMC Mortgage Securities and the Underwriters owed Freddie Mac a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  These Defendants failed to exercise such reasonable care, and in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material fact and omissions of material facts at the time of the Securitizations, as set forth above.

167.    In contrast, Freddie Mac did not know of the misstatements and omissions contained in the Prospectuses at the time it purchased the Certificates.  If it had known of those misstatements and omissions, Freddie Mac would not have purchased the Certificates.

168.    Freddie Mac acquired the Certificates in the primary market pursuant to the Prospectuses.

169.    Freddie Mac sustained substantial damages in connection with its investment in the Certificates and has the right to rescind and recover the consideration paid for the Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against General Electric, GE Capital, and GE Mortgage Holding)

170.    Plaintiff realleges paragraphs 1 through 169 above as if fully set forth herein.

171.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o ("Section 15"), against General Electric, GE Capital, and GE Mortgage Holding for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

172.    The GE Sponsor participated in the GE Depositor's violations of Sections 11 and 12(a)(2) by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the GE Depositor as the special-purpose vehicle for the Securitizations, and selecting the Underwriter Defendants as underwriters.  As sponsor, the GE Sponsor knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

173.    The GE Sponsor sold the mortgage loans to the GE Depositor and conveyed the mortgage loans to the GE Depositor pursuant to a Mortgage Loan Purchase Agreement.

174.    The GE Sponsor controlled all aspects of the business of the GE Depositor as the direct parent of the GE Depositor.  The GE Depositor was merely a special-purpose entity created by the GE Sponsor for the purpose of acting as a pass-through for the issuance of the Certificates.  As sponsor, the GE Sponsor was able to, and did in fact, control the contents of the Registration Statements filed by the GE Depositor, including the Prospectuses and Prospectus Supplements that contained material misstatements of facts and omitted facts necessary to make the facts stated therein not misleading.

175.    General Electric controlled the business operations of GE Capital, which in turn controlled the business operations of the GE Sponsor.  As the corporate parent of GE Capital, General Electric had the practical ability to direct and control the actions of GE Capital, which in turn had the practical ability, in connection with the Securitizations and the issuance and sale of the Certificates, to direct and control the actions of the GE Sponsor and GE Depositor in issuing and selling the Certificates, and in fact exercised such discretion and control over these activities.

176.    General Electric and GE Capital participated in the violations of Section 11 and 12(a)(2) set forth above.  General Electric and GE Capital oversaw and directed the actions of their subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities –such as the GE Depositor and the issuing trusts –to serve as conduits for the mortgage loans.

177.    General Electric, GE Capital, and the GE Sponsor are control persons within the meaning of Section 15 by virtue of their actual power over, control of, and/or ownership of he GE Depositor -- at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach

across the various Defendants, GE generated profits at multiple levels of the securitization process.

178.    Freddie Mac purchased the Certificates in the primary market. The Certificates were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

179.    Freddie Mac did not know of the misstatements and omissions in the Registration Statements.  Had Freddie Mac known of those misstatements and omissions, it would not have purchased the Certificates.

180.    Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

181.    Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

## FOURTH CAUSE OF ACTION

### Primary Violations of the Virginia Securities Act
### (Against GE-WMC Mortgage Securities, Credit Suisse, and MS&Co.)

182.    Plaintiff realleges paragraphs 1 through 181 above as if fully set forth herein.

183.    This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac with respect to those Certificates identified above that were purchased by Freddie Mac and issued pursuant to the Registration Statements.

184.    The GE Depositor made false and materially misleading statements in the Prospectuses for each Securitization.  The Underwriter Defendants made false and materially

misleading statements in the Prospectuses for the Securitizations effected under the Registration Statement.

185.    The Underwriter Defendants are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  The Underwriter Defendants offered the Certificates publicly, including selling to Freddie Mac the Certificates, as set forth in the "Method of Distribution" section of each Prospectus.

186.    The Underwriter Defendants offered and sold the Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Upon information and belief, the Underwriter Defendants reviewed and participated in drafting the Prospectuses.

187.    The Underwriter Defendants successfully solicited Freddie Mac's purchases of the Certificates.  As underwriters, the Underwriter Defendants were paid a substantial commission based on the amount they received from the sale of the Certificates to the public.

188.    The Underwriter Defendants offered the Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

189.    The GE Depositor is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements.  These Prospectuses were the primary documents used to sell Certificates for the Securitizations under the Registration Statements.  The GE Depositor, a statutory seller, offered the Certificates publicly and actively solicited their sale, including to Freddie Mac, for its own benefit and the benefit of GE.  The GE Depositor was paid a percentage of the total dollar amount of the offering upon completion of the Securitizations effected pursuant to the Registration Statements.

190.     With respect to the Securitizations for which it filed the Registration Statements, the GE Depositor offered the Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, the GE Depositor reviewed and participated in drafting the Prospectuses.

191.     Each of the GE Depositor and Underwriter Defendants actively participated in the solicitation of the Freddie Mac's purchase of the Certificates, and did so in order to benefit itself. Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the Certificates.

192.     Each of the Prospectuses contained material misstatements of facts and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and to Freddie Mac.

193.     The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above in Section III and IV and Appendix A, and include compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

194.     The GE Depositor and the Underwriter Defendants offered and sold the Certificates directly to Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

195.     The Underwriter Defendants each owed to Freddie Mac, as well as to other investors in these Certificates, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure

that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  The GE Depositor owed the same duty with respect to the Prospectuses for the Securitizations effected under the Registration Statements.

196.    The GE Depositor and the Underwriter Defendants failed to exercise such reasonable care.  These Defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

197.    In contrast, Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the Certificates.  If Freddie Mac had known of those untruths and omissions, it would not have purchased the Certificates.

198.    Freddie Mac sustained substantial damages in connection with its investments in the Certificates and has the right to rescind and recover the consideration paid for the Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

## FIFTH CAUSE OF ACTION

### Controlling Person Liability under the Virginia Securities Act
### (Against General Electric, GE Capital, and GE Mortgage Holding)

199.    Plaintiff realleges paragraphs 1 through 198 above as if fully set forth herein.

200.    This claim is brought under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac, which purchased the Certificates (identified in Table 9) that were issued pursuant to the Registration Statements.  This claim is brought against General Electric, GE Capital, and GE Mortgage Holding ("the Control Persons") for control-person liability with regard to the claim brought by Plaintiff pursuant to Section 13.1-522(A)(ii).

201.    The GE Sponsor was the sponsor for the Securitizations carried out pursuant to the Registration Statements filed by the GE Depositor, and participated in the GE Depositor's violations of Section 13.1-522(A)(ii) by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the GE Depositor as the special-purpose vehicle and selecting the Underwriter Defendants as underwriters.  As sponsor, the GE Sponsor knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

202.    The GE Sponsor sold the mortgage loans to the GE Depositor and conveyed the mortgage loans to the GE Depositor pursuant to a Mortgage Loan Purchase Agreement.

203.    The GE Sponsor controlled all aspects of the business of the GE Depositor as the direct parent of the GE Depositor.  The GE Depositor was merely a special-purpose entity created by the GE Sponsor for the purpose of acting as a pass-through for the issuance of the Certificates.  As sponsor, the GE Sponsor was able to control, and did in fact control, the contents of the Registration Statements filed by the GE Depositor, including the Prospectuses and Prospectus Supplements that contained material misstatements of facts and omitted facts necessary to make the facts stated therein not misleading.

204.    General Electric controlled the business operations of GE Capital, which in turn controlled the business operations of the GE Sponsor.  As the corporate parent of GE Capital, General Electric had the practical ability to direct and control the actions of GE Capital, which in turn had the practical ability to direct and control the actions of the GE Sponsor and GE Depositor in issuing and selling the Certificates, and in fact, exercised such discretion and

64

control over the activities of GE Mortgage Holding and GE-WMC Mortgage Securities in connection with the issuance and sale of the Certificates.

205.   General Electric and GE Capital participated in the violations of Section 13.1-522(A)(ii) set forth above.  General Electric and GE Capital oversaw and directed the actions of their subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities, such as the GE Depositor and the issuing trusts, to serve as conduits for the mortgage loans.

206.   General Electric, GE Capital, and the GE Sponsor are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, and/or ownership of the GE Depositor at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

207.   Freddie Mac purchased the Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Freddie Mac.

208.   Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the Certificates.

209.   Freddie Mac has sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which the General Electric, GE Capital, and the GE Sponsor are jointly and severally liable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

An award in favor of Plaintiff against all Defendants, jointly and severally, for:

a.      Rescission and recovery of the consideration paid for the Certificates, with interest thereon (in connection with this request for rescission, the Certificates are hereby tendered to the Defendants);

b.      Freddie Mac's monetary losses, including any diminution in value of the Certificates, lost principal and lost interest payments thereon, and consequential damages, including the cost of investigating the misrepresentations and performance of the underlying collateral to the Certificates, as well as any increased coupon payment on the Freddie Mac's senior preferred stock held by the U.S. Treasury Department, arising from losses on the Certificates;

c.      Attorneys' fees and costs;

d.      Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

DATED:      New York, New York
            June 28, 2012

                    KASOWITZ, BENSON, TORRES
                      & FRIEDMAN LLP

                    By: _____
                      Marc E. Kasowitz (mkasowitz@kasowitz.com)
                      Hector Torres (htorres@kasowitz.com)
                      Christopher P. Johnson (cjohnson@kasowitz.com)
                      Michael Hanin (mhanin@kasowitz.com)
                      Kanchana Wangkeo Leung (kleung@kasowitz.com)

                    1633 Broadway
                    New York, New York 10019
                    (212) 506-1700

                    *Attorneys for Plaintiff Federal Housing Finance
                    Agency, as Conservator for the Federal Home Loan
                    Mortgage Corporation*